IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 17, 2019

## HOWARD BRACKSON CARRIER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C65278  William K. Rogers, Judge**

_____

### No. E2019-01004-CCA-R3-PC
_____

The Petitioner, Howard Brackson Carrier, appeals the Sullivan County Criminal Court's denial of his petition for post-conviction relief, asserting that he received ineffective assistance of counsel and that he is entitled to cumulative error relief.  After thorough review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Kyle D. Vaughan, Kingsport, Tennessee, for the appellant, Howard Brackson Carrier.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Joseph Eugene Perrin, Deputy District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On January 28, 2011, the Petitioner was convicted of first-degree premeditated murder, felony murder, attempted first degree murder, and aggravated robbery and was sentenced to a life sentence for the merged murder convictions, 15 years for the attempted murder conviction, and three years for the aggravated burglary conviction.  See State v. Howard Brackson Carrier, No. E2013-00247-CCA-R3-CD, 2014 WL 1645389, at *1 (Tenn. Crim. App. Apr. 23, 2014), perm. app. denied (Tenn. Oct. 20, 2014).  This court recited the facts of the case on direct appeal as follows:

Brenda Carrier testified that she was married to [the Petitioner] and that they had two children born of the marriage. One of their sons was an adult and lived in his own house, while the younger son remained in the family home with [the Petitioner]. In October 2007, Ms. Carrier left the marital home and told [the Petitioner] that she "was leaving and [she] wasn't coming back." In March 2008, she moved into a second-floor garage apartment owned and furnished by her employer. In October 2008, Ms. Carrier emphasized to [the Petitioner] that "it was over, and [she] couldn't do it anymore." When he questioned her about whether her decision involved another man, she explained "that it wasn't because of a man, it was because [she] was done. [She] was done with him never being there."

Shortly thereafter, Ms. Carrier met Jeffrey Washburn. In November, she advised [the Petitioner] that she had been talking with another man. On the night of December 9, 2008, Ms. Carrier spoke with [the Petitioner] around 5:00 p.m. to ensure that [the Petitioner] would be at home with their younger son. He responded that he would be at home. Subsequently, Mr. Washburn drove Ms. Carrier to his home, where they spent the night. When Ms. Carrier left her apartment, she locked the door and turned on the porch light.

Ms. Carrier returned to her home around 5:30 a.m. on December 10. When she arrived, she first noticed that her porch light was off. Mr. Washburn and Ms. Carrier ascended the stairs, and when they reached the landing, they observed that the glass in the door was broken. Ms. Carrier suggested that they retreat and call the police, but as they turned to leave, [the Petitioner] emerged from Ms. Carrier's apartment and addressed Mr. Washburn, asking, "'Are you the man that's f* * * * * * my wife?'" Mr. Washburn responded, "'We don't need to do this. I need to go to work.'" Mr. Washburn then raised his hands and asked [the Petitioner], "'What's that in your hand?'" Ms. Carrier began to scream. She tried several times to call 9-1-1 from her cellular telephone, but she did not think the call ever connected. Mr. Washburn and [the Petitioner] began wrestling on the porch. Mr. Washburn was on top of [the Petitioner], and [the Petitioner] was stabbing Mr. Washburn in the back. Ms. Carrier knew that [the Petitioner] was a hunter and owned several knives. Ms. Carrier ran over to the tussle and removed the knife from Mr. Washburn's back. She threw the knife, which she described as "pretty big," off the porch. [The Petitioner] then stood up and pushed Mr. Washburn onto the floor of the porch.

[The Petitioner] next threatened Ms. Carrier, saying that he was going to kill her. He took Ms. Carrier into her apartment, where he displayed a pocket knife. He forced her to the ground and stabbed her in the breast, in the chest, and in the face. Ms. Carrier believed she was going to die. Patsy Kendrick, Ms. Carrier's neighbor, then entered the apartment and told [the Petitioner] to stop. She assisted Ms. Carrier to her home. An ambulance arrived and escorted Ms. Carrier to the hospital, where she remained for six days.

In the early morning hours of December 10, 2008, Patsy Kendrick heard Ms. Carrier screaming out, "Howard!" She ran toward Ms. Carrier's garage apartment as she called out for someone in her home to dial 9-1-1. Upon arriving, Ms. Kendrick saw that the glass in the door was broken, and she saw [the Petitioner] standing over Ms. Carrier with a knife. Ms. Carrier was lying on the floor, and her mouth was full of blood. [The Petitioner] appeared calm and emotionless. After Ms. Kendrick instructed [the Petitioner] to leave the apartment, he stabbed himself. Ms. Kendrick grabbed Ms. Carrier's hand, pulled her through the door, and assisted her down the stairs. They proceeded to Ms. Kendrick's home, and as she looked back, Ms. Kendrick noticed [the Petitioner] calmly walking down the stairs. Ms. Kendrick attempted to render aid while they waited for emergency medical personnel to arrive.

While Ms. Carrier's personal items were being removed from the apartment, a knife sheath and a knife sharpener were found in the apartment, but they did not belong to her. She had never seen the items during the time she lived in the apartment.

Cordell Carrier, the older son of Ms. Carrier and [the Petitioner], testified that [the Petitioner] suspected Ms. Carrier of seeing another man while they were separated. [The Petitioner] told him that "if he caught her with another man[,] he would kill him." In late November 2008, Cordell was eating lunch with [the Petitioner] in [the Petitioner]'s truck. He noticed a large hunting knife lodged in the seat of the truck and asked [the Petitioner] why he had it. [The Petitioner] answered, "[I]n case [I] needed to kill someone."

[The Petitioner] went to Cordell's home sometime after midnight on December 10, 2008, and wanted to borrow a pipe with which he could smoke crack cocaine. [The Petitioner] left then returned between 2:00 and 3:00 a.m. He again left Cordell's home. [The Petitioner] telephoned Cordell around

5:45 or 5:50 a.m. and informed Cordell that he had killed Ms. Carrier and the man she had been seeing and that he had stabbed himself. Cordell knew [the Petitioner] to be a hunter and to possess hunting knives, sheaths, and knife sharpeners. At trial, he identified a knife sheath and a knife sharpener that were found in Ms. Carrier's apartment as belonging to [the Petitioner].

Ms. Carrier's sister, Joyce Ann Hall, accompanied Ms. Carrier and others to the apartment to collect her personal belongings approximately one week after she was released from the hospital. As they were packing, Ms. Hall found a knife sharpener and a sheath and removed them from the apartment so as not to upset Ms. Carrier. Approximately three months later, Cordell asked Ms. Hall for the items, and he subsequently turned them in to a detective.

[The Petitioner] testified that in early 2008, Ms. Carrier began to stay at the garage apartment on Tuesday nights only because she worked late and received several telephone calls late into the night on those occasions. In October 2008, Ms. Carrier began staying at the apartment every night.

[The Petitioner] "sensed a change" in Ms. Carrier and attempted to take her out to dinner and buy her flowers more frequently. Ms. Carrier "started disappearing" and would be unreachable on her cellular telephone. When he questioned her whereabouts, she would respond that "it was none of [his] business." [The Petitioner] asked Ms. Carrier if she was seeing someone else, and she denied that she was.

[The Petitioner] telephoned Ms. Carrier at 12:22 a.m. on December 10, 2008, but she did not answer. He again called her at 4:56 a.m., and she indicated that she was at her home. [The Petitioner] purchased breakfast at a drive-thru restaurant and drove to Ms. Carrier's home. After knocking several times and receiving no response, he became concerned that something was wrong, so he kicked in the door. He entered the apartment and looked around to ensure that she was not in distress. At that time, he had in his possession a pocketknife, which he always carried, and his uncle's knife, which he regularly carried "as a memento to [his] uncle" who had passed away. He denied that the knife sharpener found in Ms. Carrier's apartment belonged to him.

Upon completing his search, he started to exit the apartment but encountered Ms. Carrier and Mr. Washburn at the door. He asked what was going on, and Mr. Washburn responded that he did not have time for an

- 4 -

encounter because he had to go to work. [The Petitioner] asked, "'Have you been f* * * * * * my wife?'" Mr. Washburn responded, "'Every chance [I][get].'" The two men then began fighting. [The Petitioner] said that he "blacked out" and did not recall stabbing Mr. Washburn. The next thing he remembered was Ms. Carrier's neighbor shouting for him to leave the apartment. At some point, he stabbed himself in the chest four times, but he did not recall whether he did so in Ms. Carrier's apartment or after he left. When he arrived home, he cut both of his wrists and attempted to cut his jugular vein by stabbing himself in the neck. Subsequently, the SWAT team entered [the Petitioner]'s home, and an ambulance transported him to the hospital, where he was released one to two days later and placed in custody.

Id. at *1-3 (footnote omitted).

On July 20, 2015, the Petitioner filed a timely pro se petition for post-conviction relief, in which he raised claims of ineffective assistance of trial counsel, specifically for failure to obtain a mental evaluation and failure to make a motion for judgment of acquittal, and cumulative error. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition on May 12, 2017, and the post-conviction court held an evidentiary hearing on the petition on February 25, 2019.

At the evidentiary hearing, the Petitioner testified that he met with trial counsel and his case investigator "[a]t length . . . a couple of times[.]" He elaborated that he met with them "about seven times total" during his three-year incarceration period. The Petitioner testified that trial counsel opined that it "would be best" for him to waive his preliminary hearing, which the Petitioner ultimately did.

The Petitioner testified that during his fourth meeting with trial counsel, he asked trial counsel "when and if they were going to do a mental evaluation[,]" though "no mental expert was ever sought[.]" On cross-examination, the Petitioner asserted, as he had at trial, that he "blacked out after [he] started fighting with [the victim], and [he] didn't remember anything after that." Further, he agreed, as he did at trial, that he told officers that he "stabbed himself and hit [his] heart four times, cut [his] neck and [his] wrist because [he] thought he killed them both. [He] took care of [his] problem [that] morning." The Petitioner testified that he wanted a mental health expert to testify to his "state of mind at the time that this occurred," and he conceded that he had testified to his own state of mind at trial, specifically that he "blacked out." He agreed that his "whole defense" at trial was that he "was so upset over everything, [he] wasn't guilty of anything other than voluntary manslaughter." The Petitioner conceded that he was "not aware" that "an expert can't come in and give an opinion" regarding whether he was guilty of premeditated first degree murder because "[t]hat's an issue for the jury . . . to decide."

The Petitioner also testified regarding his assertion that trial counsel should have moved for a judgment of acquittal at trial. He stated that he was "prejudiced" because trial counsel "failed to . . . do [his] rights to legal counsel." He elaborated that "On the judgment of acquittal, I believe [the prejudice] was based on the fact that – of the felony murder, that – there was no basis for that because there was . . . nothing to show that [he] was there with the intent to cause harm to anyone." He agreed that the jury rejected this assertion of prejudice at trial.

Trial counsel testified that he had been a criminal defense attorney for 42 years, 29 of which were spent as a public defender. He defended clients in "at least" 20 murder cases in that time. He explained that he met with the Petitioner "13 or 14 times in the jail." He agreed that he went over "all the discovery" with the Petitioner and that he "did not recall" the Petitioner's ever having difficulty recalling the incident or indicating that he had "blacked out" during the incident. Trial counsel further explained that the Petitioner "was very upset over his wife having a boyfriend, and that he was uncertain about it. But . . . he acted on . . . what he felt and killed the man." He further agreed that the Petitioner felt "justified" in killing the victim. Trial counsel testified that he and the Petitioner agreed that "the defense would be that [the Petitioner] was in a state of passion, and seek the jury to come back with a lesser verdict[.]"

Regarding a mental evaluation, trial counsel testified that he and the Petitioner "may have discussed the topic," but trial counsel "didn't hear enough evidence of stuff where that might be an appropriate thing to do." He explained that he wasn't "shy at all about getting doctors . . . if . . . that's necessary," but there "wasn't any need for it as far as [he] could tell." Trial counsel stated that he was "not aware of any evidence in [the Petitioner's] history that would make [trial counsel] look into that." While trial counsel "frequently hire[d] expert witnesses of some sort in cases[,]" he only did so when there was some "relevance to the case."

Regarding the judgment of acquittal, trial counsel testified that he filed "a motion for a new trial or judgment of acquittal" on June 8, 2011. He explained that he did not move for a judgment of acquittal following the close of the State's case-in-chief because he "didn't think it was warranted. Didn't think it would be any benefit to [the Petitioner]."

On April 25, 2019, the post-conviction court entered a written order dismissing the petition. The court found that the Petitioner had not "made a prima facie showing that the failure to request a mental evaluation prejudiced [the] Petitioner to the extent there is a reasonable probability that, but for counsel[']s unprofessional errors, the result of the proceeding would have been different." The court further explained that the Petitioner "did not provide any proof for which a defense of diminished capacity could be raised. There

is no proof that a mental health expert would have been allowed to testify." The trial court further found "no credence to support [the Petitioner's] theory" that "'defense counsel had a duty to move for judgment of acquittal at the close of the [S]tate's proof[.]'" The court stated that it was "most unlikely that a motion for judgment of acquittal would have been granted," noting that this court previously found that the State's proof "was overwhelming[.]" Taking all of its previous analysis of the Petitioner's claims into account, the trial court denied the Petitioner's claim of cumulative error.

## ANALYSIS

The Petitioner argues on appeal that he received ineffective assistance of counsel because of trial counsel's failure to request a mental evaluation, failure to move for judgment of acquittal, and cumulative error.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In denying relief, the post-conviction court found that the Petitioner "failed to establish by clear and convincing evidence that he is entitled to post-conviction relief." As stated above, the court further found that the Petitioner had not "made a prima facie showing that the failure to request a mental evaluation prejudiced [the] Petitioner to the extent there is a reasonable probability that, but for counsel[']s unprofessional errors, the result of the proceeding would have been different." Trial counsel testified that he was an experienced defense attorney and did not believe that a mental evaluation was necessary or justified. Further, as noted by the State, the Petitioner did not present witness testimony at the evidentiary hearing regarding his mental state to rebut trial counsel's opinion, and thus "cannot show that he was prejudiced by counsel's failure to request a mental evaluation." This court is unable to guess what such testimony regarding the Petitioner's mental state would have been. Trial counsel also explained that he did not move for a judgment of acquittal because he did not believe it was warranted. The post-conviction court also noted that the evidence was "overwhelming," and it was "unlikely" that a motion for judgment of acquittal would have been granted." In sum, the Petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel.

Finally, the Petitioner contends the cumulative effect of the errors alleged above entitles him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010). Because the Petitioner has not established any error, he is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.



_____
ALAN E. GLENN, JUDGE